IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                                    CASE NO. 1:03-cr-59-MMP-AK

JEROME W. JOHNSON,

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

This matter is before the Court on Doc. 189, Motion to Vacate under 28 U.S.C. § 2255, by Jerome W. Johnson. The Government has filed a response, Doc. 193, and Defendant has filed a reply. Doc. 194. In response to the Court's order, Doc. 212, the Government has submitted the affidavit of counsel. Doc. 215. The time for submitting a counter-affidavit has passed without further opposition from Defendant.[1] This cause is therefore in a posture for decision. Having carefully considered the matter, the Court recommends that the motion to vacate be denied.

**BACKGROUND**

Defendant was charged by Superseding Indictment with one count of conspiracy to

---

[1] Defendant moved to strike the Government's response because he did not receive an affidavit from counsel as the Court had ordered. Doc. 218. By separate order, the Court has denied that motion because counsel swore under penalty of perjury to the previously submitted unsworn letter, and thus, Defendant's motion was baseless.

manufacture, distribute, and possess with intent to distribute more than one thousand marijuana plants. Doc. 34. Shortly thereafter, the Government filed an Information and Notice of Prior Conviction, setting forth a 1985 felony conviction for sale or delivery of cocaine and a June 25, 2003, conviction for cultivation of marijuana plants from the United States District Court for the Middle District of Florida . Doc. 73. The Notice advised Defendant that because he had two or more prior convictions for felony drug offenses, he faced a mandatory life sentence. *Id*.

On February 17, 2004, Defendant appeared with his attorney, Stephen K. Johnson, for a change of plea hearing. As part of the factual basis, Defendant acknowledged:

> **JEROME WAYNE JOHNSON** understands and agrees that he was convicted on November 8, 1985, of Sale or Delivery of Cocaine, a felony drug offense, in the Circuit Court, Fourth Judicial Circuit, Duval County, Florida, Case Number 82-6587-CF; and convicted on June 25, 2003, of Cultivation of Marijuana Plants, a felony drug offense, in the United States District Court, Middle District of Florida, Jacksonville Division, Case Number 3:03-cr-36-J-25TEM. The Government believes these are prior convictions within the meaning of Title 21 U.S.C. § § 851 and 841(b)(1)(A). The Defendant reserves his right to object to the use of these prior convictions as a basis for the sentencing enhancement at the sentencing hearing. The Defendant understands that if the Court determines these are prior convictions, he is subject to a sentence of mandatory life imprisonment.

Doc. 95. The Court questioned Defendant regarding his understanding of this provision following its placement on the record:

> THE COURT: The maximum sentence that could be imposed upon your plea of guilty being accepted by the Court, based upon the establishment of two prior felony drug convictions, would be a mandatory minimum of life imprisonment....
>
> Do you understand, Mr. Johnson, that if your guilty plea is accepted, you face a maximum mandatory life imprisonment....
>
> THE DEFENDANT: Yes, I do, Your Honor.

*Case No: 1:03-cr-59-MMP-AK*

Doc. 156 at 14-15.  After questioning Defendant regarding his understanding of the Sentencing Guidelines, the Court asked Defendant: "Do you understand further, Mr. Johnson, that since the statute here involved does require the imposition of a mandatory minimum sentence, that that sentence must be imposed upon you even though your guidelines might call for a lesser term of imprisonment?"  Defendant replied, "I understand, Your Honor."  *Id*. at 16.  Defendant advised the Court that at the time he signed the Plea Agreement, he "fully" understood "all of its terms and conditions" and that "the matters set forth and contained [in the Factual Basis were] true and correct."  *Id*. at 17-18.  He further assured the Court that he and his attorney had discussed the Plea Agreement in detail and that it had been explained to him.  *Id*. at 24.  Defendant also told the Court that no promises or inducements had been made to him and that no one had used "any type of threat, force, pressure, intimidation of any type" to make him plead guilty.  *Id*. at 24-25.  With regard to his attorney's representation, Defendant advised the Court as follows:

> THE COURT: Have you had sufficient time to discuss your case fully with your lawyer and to explain to him everything that you know about the facts of the case and your involvement in this case?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: And have you done so?
>
> THE DEFENDANT: Yes, I have, Your Honor.
>
> THE COURT: During these conferences with your lawyer, has he generally answered what questions you may have and has he advised you where he thinks you may fall within the sentencing guidelines based upon his current knowledge of the facts of the case as well as any prior criminal history that you may have?
>
> THE DEFENDANT: Again, we discussed this, but we don't have no factual

*Case No: 1:03-cr-59-MMP-AK*

|                    |                                                                                                                                   |
|--------------------|-----------------------------------------------------------------------------------------------------------------------------------|
|                    | basis on the guidelines yet, so it cannot be put into that conversation. |
| MR. JOHNSON:       | We have gone over the minimum mandatories which are much more extensive than the guidelines and he understands the dynamics of the factors. |
| THE COURT:         | Are you satisfied with your lawyer and the way that he has represented you in this case? |
| THE DEFENDANT:     | Yes, I am, Your Honor. |
| THE COURT:         | Do you have any complaint whatsoever about the way that Mr. Johnson or anyone from his office may have represented you? |
| THE DEFENDANT:     | Absolutely not, Your Honor. |

*Id*. at 26-27.

Both counsel for Defendant and the Government then assured the Court that there had "been no assurances, promises or understandings...given to this defendant as to the disposition of his case which are in any way different or contrary to what [the Court has] discussed with him and we have now made a matter of record here in open court[.]" *Id*. at 27.

The Court found that Defendant was "alert and intelligent," that he understood the charges against him and appreciated the consequences of pleading guilty, and that his "decision to plead guilty is freely, voluntarily and intelligently made...." *Id*. The Court therefore accept the guilty plea but withheld formal adjudication of guilt. *Id*. at 28

Before sentencing, the probation officer submitted her proposed Presentence Report to the parties. Doc. 103. According to the Government,[2] the officer originally determined that

---

[2]The Court has only the revised PSR in hand, and thus, it does not have at its disposal the original PSR. Defendant has not, however, disputed the Government's recitation of the pertinent

Defendant should not be assessed any criminal history points for the marijuana cultivation conviction from the Middle District of Florida, involving a marijuana grow operation in Ft. White, Florida, because the instant offense and the Middle District offense constituted "a common scheme or plan, in that they are substantially connected to each other by common accomplices, common purpose and similar <u>modus operandi</u> pursuant to 1B1.3 (Application Note 9)." Furthermore, the officer concluded that although Defendant faced an enhanced sentence, he qualified for safety valve relief under 18 U.S.C. § 3553(f), which allows a court to impose a Guidelines sentence in lieu of a mandatory minimum sentence under certain circumstances. The Government objected to these conclusions. As to the Middle District conviction,[3] the Government argued that the Ft. White operation

> was an independent, separate grow, which the defendant operated alone, with no assistance from the individuals involved in the Gainesville conspiracy....
>
> Contrary to probation's assertions, the Gainesville co-conspirators were not involved in the Ft. White grow. The purpose of the Ft. White grow was solely to enrich Johnson. Furthermore there were differences in the <u>modus operandi</u> between the Ft. White and Gainesville grows....
>
> The Ft. White grow is an *isolated, unrelated* event that happens only to be similar in kind and is not "related" conduct simply because they both involve marijuana cultivation. There was no overlap in participants other than Johnson. The grows

---

contents of the original PSR, and the Court has no hesitation in accepting those representations.

[3]Defendant pled guilty to one count of cultivation of marijuana and at sentencing requested safety valve relief, which the court denied based on Defendant's failure "to fully disclose all the circumstances of his offense because [he] failed to give authorities information about the intended distribution." *United States v. Johnson*, 375 F.3d 1300, 1301 (11th Cir. 2004). The Eleventh Circuit affirmed the 60-month sentence holding that the court "properly determined that information about the intended distribution related to Johnson's offense of conviction" and that because Defendant refused to tell law enforcement about the intended distribution of the marijuana, the court did not err denying Defendant safety valve relief. *Id*. at 1302-03.

> were in separate geographic locations....The defendant's Ft. White grow was an independent economic entity, separate from his involvement in the Gainesville conspiracy. The defendant did not split any of the profits from his own operation. Marijuana from the Ft. White grow was not distributed through any of the Gainesville co-conspirators....The offense in the instant case is a conspiracy to manufacture and distribute marijuana in various grow houses in the Gainesville area. At most, the defendant gave marijuana clones from this grow to the co-conspirators on a few occasions. However, this limited assistance does not otherwise make his separate operation "related" to the Gainesville conspiracy. To lump these discrete and unrelated grow operations together for purposes of defining relevant conduct would require the Court to ignore the wholly distinct nature of these crimes, simply because they both involved marijuana.

Doc. 112 (citations omitted) (emphasis in original). Thus, according to the Government, because the Middle District conviction was not "relevant conduct" to the Gainesville offense, Defendant should be assessed criminal history points for the Middle District conviction. *Id*. Alternatively, it argued that if the Court concluded that the Middle District conviction was "relevant conduct," thereby precluding the assessment of criminal history points for that conviction, then the amount of marijuana plants involved in the Middle District conviction should be included in Defendant's base offense level. *Id*.

As to the safety valve provision, the Government argued that Defendant did not meet the statutory requirements for its applications, in part, because the Middle District conviction "should be assigned criminal history points...." *Id*.

Defendant also filed objections. Doc. 117. He argued that the mandatory minimum life provision of 21 U.S.C. § 841 did not apply to him because the Middle District conviction, which was on appeal, was not final before the commission of the instant offense. *Id*. Therefore, according to Defendant with only one prior felony drug conviction, he faced only a twenty-year minimum mandatory sentence. *Id*. He also argued that because the Gainesville grow operation

and the Ft. White grow operation involved a common scheme or plan and the same course of conduct, the Ft. White operation was relevant conduct, and he should be held accountable for the marijuana plants at both locations.  *Id*.

Subsequently, Defendant filed a motion and amended motion pursuant to 21 U.S.C. § 851(c), claiming that his sentence should not be enhanced based on the Middle District conviction because it was not a "prior conviction" and had not "become final," as required for enhancement under § 841.  Docs. 119 & 120.

The parties appeared for sentencing on May 25, 2004, and after denying Defendant's request for a continuance so that Defendant could continue cooperation, the Court heard argument on the remaining matters.  The Court addressed the amended motion regarding enhancement at which time the Government conceded that the 2003 Middle District conviction could not be used to seek a mandatory minimum life sentence, and the parties agreed that because of a 1982 sale of cocaine conviction, Defendant did face a minimum mandatory 20-year sentence.  Doc. 157 at 8.  After lengthy argument regarding the parties' objections, the Court found: "I do find that the Middle District of Florida grow in Fort White, Florida is not relevant conduct, does not fit the criteria.  It is an independent grow operation.  It just happened to involve marijuana."  *Id*. at 43.  A question then arose as to whether Defendant should be assessed one or three criminal history points for the Middle District conviction, which affected whether the safety valve provision would apply.  *Id*. at 43-44.  Defendant therefore requested a continuance of sentencing to research the "matter of whether or not there's one criminal history point or three."  *Id*. at 45.  The Court granted a short continuance with a caution that "[n]o other matters will be considered by the Court except for that one issue.  We're through with arguing

everything else." *Id*. at 45-46.

The following day, Defendant filed a motion for reconsideration of the application of relevant conduct to sentencing. Doc. 132. More particularly, he argued that based on newly discovered evidence, the Court should reconsider its conclusion that the Middle District conviction did not constitute relevant conduct to the instant offense. *Id*. In support, he submitted a letter from Defendant's public defender to the prosecutor in the Middle District case implicating persons involved in the Gainesville grow operation in the Middle District grow operation. *Id*.

On May 27, 2004, the parties again appeared, and though Defendant conceded that the Middle District conviction would garner him three criminal history points, Doc. 158 at 2, he continued to argue that the Middle District conviction was relevant conduct to the instant offense and requested a continuance so that an evidentiary hearing could be held on the issue. *Id*. at 3. The parties engaged in lengthy argument on this point, and the Court denied the continuance, finding that the relevant conduct issue was a "closed issue" and reiterating: "The matter this Court determined then and I determine now is that the Fort White grow was a separate grow; it was not connected. It was not relevant conduct." *Id*. at 17. Defendant then requested a continuance so that counsel "can look into the issue of withdrawing his plea based upon a misunderstanding and the misrepresentation by my office as to the facts." *Id*. at 18. The Court denied the continuance, and counsel orally moved to withdraw the plea "based on the instructions of my client." *Id*. When the Court requested the basis for withdrawing the plea, counsel first stated, "I don't know the basis of it," and then argued "the best [he could]," that "It has to do with the potential of a life sentence, it has to do with advice, it has to do with fear." *Id*.

at 18-19.  The Court denied the ore tenus motion to withdraw the plea, finding, "It appears...that the sole basis is he is unhappy with the sentence."  *Id*. at 19.

The Court then found that with a total offense level of 23 and a criminal history category of II, Defendant's Guidelines range was 51 to 63 months.  *Id*. at 20.  However, because of the statutory minimum mandatory sentence of 20 years to life, the Court sentenced Defendant to 20 years to run concurrently with the Middle District sentence.[4]  *Id*.; *see also* Doc. 137.

Defendant appealed with new counsel, Robert Harper.  Doc. 140.  On appeal, he raised three issues: (1) whether the Court correctly determined that the Middle District conviction was not relevant conduct; (2) whether the Court correctly denied the motion to continue sentencing; and (3) whether the Court correctly denied the motion to withdraw plea.  Doc. 193, Ex. A.  The Eleventh Circuit *per curium* affirmed without opinion.  Doc. 188.

The instant motion to vacate followed.  Doc. 189.  Defendant raises eight claims for relief, each of which will be discussed in turn.

## DISCUSSION

1.  "Successive prosecution after plea to lesser included offense is barred."

In this claim, Defendant maintains that because the charge in the Middle District was a lesser included offense to the charge in this case, he was subjected to double jeopardy.  According to Defendant, "the only difference between the Middle District and Northern District cases is that the first was charged as a simple growing operation and the second was charged as

---

[4]Though the Court did not specifically address the safety valve issue, Defendant was not entitled to relief thereunder since, in light of the Court's ruling that the Middle District conviction was not relevant conduct, he had more than one criminal history point.  *See* 18 U.S.C. § 3553(f)(1).

"Conspiracy to grow." Doc. 189, Mem. at 8. In his view, the Middle District case is a lesser included offense of the instant case because (1) the plants charged in the Middle District case were "charged again" in this case, (2) the same people were involved in each case, (3) the technology used in both cases was the same, (4) the cases "took placed in the same generic area of Northern Florida," and (5) both cases occurred over the same time period. *Id*. at 7-8.

Though phrased now as a double jeopardy claim, these are the same arguments which Defendant presented to the Court in support of his claim that the Ft. White grow operation was relevant conduct to the crimes charged in this case. To reach Defendant's double jeopardy argument, the Court would have to reconsider certain factual conclusions which both it and the court of appeals have already rejected, and thus, to that extent the Court has no intention of reconsidering the appellate court's conclusion. *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000), *cert. denied*, 531 U.S. 1131 (2001). Furthermore, Defendant's attempt to recast the factual underpinnings of his relevant conduct argument as a constitutional violation is without merit, since his voluntary guilty plea[5] waived his right to raise a double jeopardy objection in this proceeding. *Dermota v. United States*, 895 F.2d 1324, 1325-26 (11th Cir. 1990).

2.   "Court erred in assigning a minimum mandatory sentence triggered by my criminal history."

Defendant's minimum mandatory 20-year sentence was triggered by the 1982 conviction in Duval County, Florida, for sale of cocaine. He was originally sentenced to four years imprisonment, but later, on a motion for reduction of sentence, the sentence was reduced to

---

[5] Defendant also challenges the voluntariness of his plea, but as will be discussed *infra*, that claim is meritless.

twelve months. PSR at ¶ 36. According to Defendant, this conviction could not be used to enhance his sentence because it was too old, and it did not meet "the year and a month" requirement contained in the Sentencing Guidelines. Doc. 189.

While this conviction may have been too old to be scored under the Guidelines, *see generally* U.S.S.G. Manual at ch. 4, pt. A, Defendant's minimum mandatory sentence was driven by statute, not the Guidelines, and there is nothing in either § 841 or § 851 which operates as a temporal restriction on the predicate prior felony conviction. Indeed, because the 1982 conviction "occurred more than five years before the date of the information alleging such prior conviction," 21 U.S.C. § 851(e), it was established as a matter of law and was not challengeable. *United States v. Williams*, 438 F.3d 1272, 1274 (11th Cir. 2006); *United States v. Weaver*, 905 F.2d 1466, 1482 (11th Cir. 1990).

    3.    "Plea not knowingly and intelligently given–Defendant reliance upon affirmative Mis-Advice of counsel."

According to Defendant, "throughout the period leading up to the plea and continuing up to and through sentencing my attorney...mis-advised me as to the consequences of a plea in this case." Doc. 189. Defendant charges that counsel "specifically instructed me that the most I could get was 37 to 46 months and took steps to insure my plea and refused to allow me to withdraw it." *Id*.

This allegation is flatly belied by various attachments to Defendant's motion to vacate. The first exhibit is an April 19, 2004, letter from counsel to Defendant in response to Defendant's April 4, 2004, letter. Doc. 189, Ex. 1 P. 1. In that letter, counsel answered Defendant's questions regarding certain matters raised in the initial PSR. At that time, counsel

advised Defendant that based on the officer's conclusion that Defendant qualified for safety valve relief, he was not facing a mandatory minimum sentence, but instead, would be facing a sentence of 37-46 months.

The second critical letter is Defendant's April 4, 2004, letter to counsel, which begins with a recognition that if safety valve relief were not given, "I would be facing a life sentence." Doc. 189, Ex. 1 P. 3. Defendant concluded: "I guess I think I'm mostly relieved–no life sentence. Although I would like to raise all of the above issues, I do not want to do anything at this junction that would lead to the life sentence coming back." *Id*. (emphasis in original).

The third important letter is Defendant's April 5, 2005, letter to counsel in which he advised counsel that he believed he had found a "very major mistake" in his favor, namely, that the "enhanced mandatory life sentence applicable...due to my prior two felony convictions does not apply." *Id*. He expressed concern regarding whether the application of the safety valve would also make the mandatory minimum 20-year sentence inapplicable and advised counsel that if the officer had made a mistake and "I should have gotten the 20 years m.m. but didn't, I definitely don't want to do anything now that would cause the probation officer or U.S. Attorney to catch this error." *Id*. However, "[i]n the unfortunate event the Government notices this error," Defendant proposed challenging the number of marijuana plants at issue so as to place him in the five-year mandatory minimum category, rather than the twenty-year category, and he asked counsel, "Would we have to then try to withdraw my plea...." *Id*.

In the next letter dated April 29, 2004,[6] Defendant told counsel that the letter "is just

---

[6]This letter actually is attached to the front of Ex. 1 P. 3, but for clarity, the Court has considered the letters in chronological order.

thoughts" that Defendant wanted to "run...by" him, one of those "thoughts" being that he "withdraw my plea and go to trial." *Id*. He closed with a reiteration that these were just thoughts "going around [his] head (brain)." *Id*.

In a letter to counsel dated May 2, 2004, Defendant recognized that even with the one prior felony drug conviction from 1982, he "face[d] a mandatory 20 years minimum, if properly sentenced, unless we can prove less than 1000 plants...." Doc. 189, Ex. 2. "So we have to keep asking: is there any way to avoid the 20 years as well as the life sentence?" *Id*. He then explained at length to counsel why the Middle District conviction did not count as a prior felony conviction. *Id*. He acknowledged that any attempt to show that the Middle District grow was relevant conduct would be "inconsistent with...any attempt to even say I'm not guilty of this offense–<u>to withdraw my plea</u> and have a trial." *Id*. (emphasis in original). He later devoted a section of the letter to "Withdraw plea/Rule 11," arguing that he can show "'just cause'" based on "[i]mproper advice...about life sentence <u>which did not</u> apply....I'm not guilty?"[7]

The only time that counsel told Defendant that he was looking at a Guidelines sentence of 37-46 months was in a letter written before the Government's objections to the PSR were filed. At that time, counsel's conclusions were correct, i.e., if the Court accepted the officer's determination that Defendant qualified for safety valve relief because his criminal history score, without the Middle District conviction, was zero, then Defendant was facing a Guidelines sentence, not a minimum mandatory sentence. That, of course, changed when the Government challenged the officer's determination, and throughout the remainder of Defendant's

---

[7]The Court has placed ellipses in this quote because the document is illegible in certain parts.

correspondence, it is imminently clear that he knew the consequences of pleading guilty, i.e., he was going to receive a minimum mandatory sentence of 20 years to life depending on how the Court ruled on the Government's objections unless he could find some other way to manipulate the sentencing outcome. Defendant's letters, which are intelligent and articulate, show Defendant's thorough understanding of his circumstances and nothing to suggest that he had pled guilty under any false illusions. Furthermore, there is not one direction to counsel to file a motion to withdraw the guilty plea. Instead, it is clear that Defendant was contemplating this as one of his options, and in fact, he had researched the issue sufficiently to know that before the Court would even consider allowing him to withdraw his plea, he would have to make a showing of "just cause." *See* Fed. R. Crim. P. 11(d)(2) (defendant may withdraw guilty plea after court accepts plea if defendant can show fair and just reason for requesting withdrawal). While Defendant suggested withdrawing the plea as a possibility, he never unequivocally told counsel to take that path, and he has presented absolutely nothing to support his contention that counsel refused to follow his directions in that regard. This claim is factually without merit.

    4.    "The court erred in applying an enhancement to my sentence based upon conduct which was related to this case."

This claim is based on the Court's conclusion that the Ft. White grow operation in the Middle District of Florida was relevant conduct to the grow operation in this case. That claim has been considered and rejected by the appellate court, and the Court will not reconsider it in this proceeding. *Nyhuis*, 211 F.3d at 1343.

    5.    "The government may not violate the terms of its own negotiated plea agreement."

According to Defendant, by objecting to the PSR, the Government violated the terms of

the Plea Agreement, wherein it had agreed to "abide by the sentence calculations based upon the United States Sentencing Commission Guidelines...." This argument is patently frivolous. While the Government agreed that the Sentencing Guidelines applied to this case, as opposed to a situation pre-dating the establishment of the Guidelines, it did not agree to a Guidelines sentence. Instead, the sentence to be imposed was left "solely" to the Court's discretion, which was "limited only by statutory provisions and the Sentencing Guidelines." Doc. 95. Furthermore, the Government specifically advised Defendant, "Regardless of any prior representations, the United States Attorney will not agree to recommend or be bound to recommend a specific sentence." *Id*. In fact, it advised him before the plea that it intended to seek a mandatory life sentence against him, and there is nothing in the Plea Agreement or the plea colloquy to suggest that the Government deviated from its standard practice of not binding itself to a sentencing recommendation. In fact, in the Factual Basis supporting the Plea Agreement, a document which Defendant signed, Defendant specifically agreed that if the Government could prove two prior felony convictions, he faced a mandatory life sentence pursuant to Title 21 U.S.C. § § 851 and 841(b)(1)(A). *Id*. While Defendant properly reserved the "right to object to the use of these prior convictions as a basis for the sentencing enhancement at the sentencing hearing," he could not have seriously harbored any notion that the Government had agreed to a Guidelines sentence.

      6.     "The government participated in illegal Sentence Factor Manipulation."

In this claim, Defendant charges that the Middle District prosecution was "intentionally severed into two separate prosecutions...so that the second prosecution could be artificially enhanced by the Plea earlier entered in the first prosecution." Doc. 189. It is clear that the bases

of this claim are the same as those underlying the relevant conduct arguments made before sentencing and on appeal and the double jeopardy argument made in this proceeding, and the validity of those underlying facts will not be now be reconsidered, as they were affirmed on appeal.  Furthermore, the Court can find no support for a sentencing factor manipulation claim in the context now presented as a matter of law, since this kind of claim has never been considered by the Eleventh Circuit in any context other than where a government sting operation was involved.  *See United States v. Sanchez*, 138 F.3d 1410, 1414 (11th Cir. 1998) (fact that Government's fictitious reverse sting operation involved large quantity of drugs did not amount to type of manipulative government conduct warranting downward departure in sentencing); *see also United States v. Ciszkowski*, 492 F.3d 1264, 1270 (11th Cir. 2007) (citing *Sanchez* and finding that Government did not engage in sentence factor manipulation when it provided firearm with silencer to defendant in murder for hire case); *United States v. Bohannon*, 476 F.3d 1246, 1252 (11th Cir. 2007) (citing *Sanchez* and finding that undercover officer's selection of victim's age in internet sex sting was "no more manipulative than in any other sting operation"); *United States v. Govan*, 293 F.3d 1248, 1251 (11th Cir. 2002) (citing *Sanchez* and finding that Government's continued purchases of drugs from defendant on separate occasions, rather than arresting him after first buy, was not manipulative).

       7.       "Denial of 6th Amendment right to counsel of choice on Appeal."

In this ground, Defendant complains that it is "obvious...that there were serious problems between my appeals attorney [Robert Harper] and myself," and he argues that he "did everything that I could have done to show the court the level of negligence and ineffective assistance in Mr. Harper's representation."  Doc. 189.  According to Defendant, he "wrote to the court

complaining about [Mr. Harper] and copied the court on my complaint to THE FLORIDA BAR including, his, Mr. Harper's, threat which would have resulted in no appeal brief being filed at all!" *Id.* In short, Defendant was "dissatisfied with [Harper's] representation." Doc. 189, Mem. at 28.

After trial counsel filed the notice of appeal on Defendant's behalf, Doc. 133, the Court appointed Robert Harper as appellate counsel. Doc. 140. The date of the appointment was June 10, 2004. *Id*. On June 30, 2004, Mr. Harper requested the relevant transcripts and the PSR. Docs. 147 & 148. The court reporter did not receive the transcript order form until July 12, 2004, and did not receive the CJA authorization for payment of the transcript until July 26, 2004. Docs. 150 & 152. Without dispute, by July 28, 2004, Michael Ufferman, who worked in Mr. Harper's firm, had visited Defendant in jail to discuss the appeal as indicated by Defendant's first letter to Mr. Harper. Doc. 189, Ex. 6 P.2; *see also* Doc. 215, Ex. at 12 of 43.

On August 15, 2004, Defendant again contacted Mr. Harper, complaining that he had not yet received the transcripts. Doc. 215, Ex. at 3 of 43. At that time, Mr. Harper himself had not received the transcripts, and indeed, there continued to be problems associated with the transcripts until the Court issued an order on August 25, 2004, directing the court reporter to transcribe and file under the seal the plea and sentencing proceedings and to provide copies to counsel. Doc. 155. The transcripts were filed the following day, Docs. 156-159, and on September 1, 2004, the Court granted Mr. Harper's request for a copy of the PSR. Doc. 160.

On September 15, 2004, Defendant sent Messrs. Harper and Ufferman, the "4th letter that I have written to your office since July 27, 2004," requesting information about his appeal and complaining that counsel were not keeping informed about its progress. Doc. 215, Ex. at 19 of

43.

The initial appellate brief was due on October 5, 2004. Doc. 215, Ex. at 7 of 43. On September 30, 2004, for personal and professional reasons, counsel requested an extension of that deadline, Doc. 215, Ex. at 5-10 of 43, and on that same day, Defendant sent the Court a letter complaining that he had been "abandoned" by appellate counsel. Doc. 215, Ex. at 11 of 43. By October 5, 2004, Defendant had filed a complaint against Messrs. Harper and Ufferman with the Florida Bar complaining that he had written counsel on four separate occasions about his appeal and had not yet received any response from them. Doc. 215, Ex. at 18 of 43. On October 19, 2004, Mr. Harper advised Defendant that because of the Bar complaint, "we will move to withdraw our appearance as counsel of record in your case immediately." Doc. 189, Ex. 6 P.2. He continued: "If you desire our continued representation, you must immediately cause the complaint to be dismissed." *Id*. Two days later, Defendant advised the Bar that he had "been in contact with both attorneys and we have worked out our problems." Doc. 215, Ex. 30 of 43.

In Defendant's view, Mr. Harper's "threat" of withdrawal deprived him of his right to select counsel of his own choice. Defendant is mistaken. Because the Court appointed Mr. Harper to represent him as an indigent defendant, he had no strict right to the attorney of his choice but only to effective representation by a competent attorney. "Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). Therefore, in contrast to the defendant in *United States v. Gonzalez-Lopez*, 126 S.Ct. 2557 (2006), Defendant did not hire

Mr. Harper to represent him, and thus, he was never deprived of "his right to select counsel of [his] choice" as that phrase is defined by the Supreme Court. *Gonzalez-Lopez*, 126 S.Ct. at 2563.

Furthermore, it is quite evident that Defendant was not "abandoned." Counsel may not have copied Defendant on every piece of paper which left his office regarding Defendant or apprised Defendant of every telephone call related to him, but counsel certainly did not show "he was not capable" or that Defendant's "appeal brief would be substandard and ineffective," as Defendant suggests. Doc. 189, Mem. at 27. While the Court recognizes that this case and the Middle District case were the only two cases on which Defendant had to focus, counsel, like all attorneys, was juggling myriad responsibilities, and quite frankly, Defendant's expectations were–and still are–unrealistic. Counsel visited him in jail, he secured the transcripts and the PSR, he met his appellate deadlines, and he made cogent arguments on appeal. When Defendant complained about counsel's performance to the Bar, counsel did what he should have done–he advised Defendant of the consequences of his actions, namely, that counsel would have to withdraw if Defendant did not dismiss his complaint. Whether the Court would have granted a motion to withdraw is a separate issue, but certainly, when a client is so dissatisfied with his attorney's representation that he seeks redress through the Bar, counsel has no alternative but to seek withdrawal, a conflict obviously having arisen, at least in the client's mind, between the client and counsel. Even if counsel had moved to withdraw and the Court had granted the motion, Defendant would not have been without counsel. Instead, substitute counsel would have been appointed, and the appeal would have proceeded.

This claim is patently meritless.

8. "Overall violation of the 6th Amendment guarantee of Effective Representation of

Counsel."

In this final claim, Defendant charges that counsel's failure to "detect[ ] and correct[ ]" each of the issues raised in the instant motion to vacate constituted ineffective assistance of counsel. Because the Court has found no merit to any of Defendant's claims, counsel cannot have act deficiently in failing to bring these matters to the Court's attention, as counsel is never required to present or argue meritless or frivolous issues.

## CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that Defendant's motion to vacate, Doc. 189, be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida, this __12th__ day of February, 2008.

*s/ A. KORNBLUM*
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**